**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SCOTT FIGVED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 13 C 7839** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **CAROLYN W. COLVIN, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Scott Figved, seeks review of the final decision of the Commissioner ("Commissioner") of

the Social Security Administration ("Agency") denying his application for Disability Insurance

Benefits under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Mr. Figved asks

the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an

order affirming the decision.

**I.**

**PROCEDURAL HISTORY**

Mr. Figved applied for DIB on February 19, 2010, alleging that he has been disabled since

April 24, 2009 – he later changed this to November 1, 2009 – due to back problems, obesity,

epilepsy, and sleep apnea. (Administrative Record ("R") 223-24, 262). His application was denied

initially and upon reconsideration. (R. 63-66, 102-105). Mr. Figved then filed a timely request for

a hearing before an administrative law judge. (R. 110-117).

An ALJ convened a hearing on November 11, 2011 (R. 52-62), which was continued to June

11, 2012, to allow Mr. Figved to submit additional records. (R. 18-51). Mr. Figved testified and was represented by counsel. In addition, Laura Rosch testified as a medical expert, and Jill Radke testified as a vocational expert. On June 27, 2012, the ALJ issued an unfavorable decision, denying Mr. Figved's application for DIB because he retained the capacity to perform sedentary work as long as he could stand for three minutes each hour, did not have to climb ropes or scaffolds or work around dangerous machinery, at unprotected heights, or in extreme temperatures. (R. 70-86). The ALJ's decision became the Commissioner's final decision on July 31, 2013, when the Appeals Council denied Mr. Figved's request for review. (R. 5-10). See 20 C.F.R. §§404.955; 404.981. Mr. Figved appealed that decision by filing suit in this Court under 42 U.S.C. §405(g), and both parties consented to jurisdiction here pursuant to 28 U.S.C. §636(c).

## II.

## THE RECORD EVIDENCE

### A.

### The Vocational Evidence

Mr. Figved was born on July 7, 1977, making him thirty-four years old at the time of the ALJ's decision. (R. 258). He is 6' 1" tall and, during the application process, his weight has ranged from 323 pounds to 377 pounds. (R. 26, 262). He went to community college for two years. (R. 25). His work experience, for the most part, has been in hospitals, as a housekeeper, a patient care technician, and an emergency medical technician. The work ranged from light to medium in terms of exertion. (R. 25, 85, 40-41, 281).

**B.**

**The Medical Evidence**

The record in this case is an all but unmanageable jumble of over 3000 pages, thrown together in no particular order. Judging from Mr. Figved's brief, however, nearly all of it is irrelevant – Mr. Figved cites just a few pieces of evidence to support his claim for DIB, and he accepts the ALJ's statement of the evidence. [Dkt. # 14, at 2]. Accordingly, the relevant medical evidence will be discussed in connection with addressing Mr. Figved's arguments. Suffice it to say that the great weight of medical opinion in this case indicates that Mr. Figved is capable of at least a limited range of sedentary work. (R. 39-40, 415, 619, 618, 825, 952-957, 987, 1072, 1308).

**C.**

**The Administrative Hearing Testimony**

**1.**

**The Plaintiff's Testimony**

Mr. Figved testified that he left his last job doing general housekeeping at a hospital because of dizziness and low back pain and just generally being unable to perform his duties. (R. 26). He couldn't lift, nor could he stand for long periods of time. (R. 27). Mr. Figved testified that, while he weighed 377 pounds, he ate only very healthy foods. (R. 27). He explained that obesity ran in his family. (R. 28).

Mr. Figved said he could walk no more than two blocks before he had to sit down due to pain in his back. (R. 29). He had sleep apnea and used a CPAP at night. (R. 29). He also had a pressure adjustable bed. (R. 31). Mr. Figved testified that he took Zonegran and Keppra for his seizures; also Clonazepam and Felbatol. (R. 32). The last seizure he had was two or three months earlier. (R. 33).

Over the previous year, he had not had a seizure that required hospital treatment. (R. 33). He had no side effects from his medication, which he and he tolerated well. (R. 35). The CPAP machine was also working well. (R.36).

Mr. Figved said that on a typical day, he would get up, shower, and prepare a breakfast of cold cereal or a microwave sandwich and fruit. (R. 46). He said he spent most of the day lying in bed, because if he sits up too long, he has too much pain. (R. 46). He occasionally goes out to do errands, but not too much. (R. 46). He was collecting disability from his job until four months before the hearing. (R. 47). Mr. Figved admitted that his doctors told him he could lift up to 25 pounds. (R. 47). He was able to drive 2-3 times a week, either to his parents' house or to the train station. (R. 47). He used public transportation quite a bit. (R. 50).

## 2.

### The Medical Expert's Testimony

Dr. Rosch then testified as a medical expert. She summarized her review of the medical record at length. (R. 37-39). Dr. Rosch felt that Mr. Figved's condition did not meet a listed impairment, specifically the listing for epilepsy or for disorders of the spine. (R. 39, 45). She thought that Mr. Figved could occasionally lift 20 pounds and frequently lift 10. He could only stand or walk for two hours of a workday, but he could sit for 6 hours if he could stand and stretch for 3 minutes out of every hour. He should not have to use ladders, ropes, or scaffolding. He could not work at unprotected heights, operate heavy vehicles, or work in extreme temperatures. (R. 40).

## 3.

### The Vocational Expert's Testimony

Next, the vocational expert, Jill Radke, testified. She explained that Mr. Figved's past work

ranged from light to medium in terms of exertional levels and was skilled or semi-skilled. (R. 42). The ALJ asked Ms. Radke whether an individual who could perform sedentary work that allowed for standing for three minutes out of every hour, and that did not require climbing ladders, ropes, or scaffolding, or working at unprotected heights, with dangerous machinery, or in extreme temperatures could perform any unskilled jobs in the national economy. (R. 42). Ms. Radke testified that such and individual could be an order taker (7370 positions in the state of Illinois), office clerk (3900 positions), or receptionist (3900 positions). (R. 42-43).

## D.

### The ALJ's Decision

The ALJ found that Mr. Figved suffered from the following severe impairments: "morbid obesity, seizure disorder, sleep apnea, degenerative disc disease, and subacute compression fracture." (R. 72). He further found that Mr. Figved did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 73-74). Specifically, the ALJ found that his impairments did not meet listings 1.04 covering disorders of the spine, 3.20 covering pulmonary insufficiency, or 11.02 or 11.03 covering epilepsy. (R. 73-74). The ALJ also specifically considered the effects of Mr. Figved's obesity in this context. (R. 74).

The ALJ then determined that Mr. Figved retained the capacity to perform sedentary work as long as he could stand for three minutes each hour, did not have to climb ropes or scaffolds or work around dangerous machinery, at unprotected heights, or in extreme temperatures. (R. 74). The ALJ went on to discuss the medical evidence. Necessarily, the discussion was a lengthy one with the ALJ reviewing objective findings and medical opinions. The ALJ gave great weight to the opinion of the medical expert, Dr. Rosch, and to the first two opinions from Mr. Figved's treating

physician, Dr. Schneider, that Mr. Figved could perform sedentary work. (R. 84). The ALJ gave little weight to Dr. Schneider's third opinion – in which he found Mr. Figved disabled – as it contradicted the other two and was not supported by his treatment notes. (R. 84). The ALJ accorded some weight to the opinions of the state disability reviewing physicians and to that of Dr. Cherchi that Mr. Figved could work at a desk job. (R. 84-85). He gave little weight to the opinions of Drs. Luhrs and Jordan because their opinions were not supported by any clinical evidence. (R. 85).

The ALJ found Mr. Figved's allegations not credible to the extent they were inconsistent with a capacity to perform sedentary work. He noted that Mr. Figved's seizures were well-controlled. His daily activities were not as limited as one would expect of a totally disabled individual, as Mr. Figved claimed. (R. 84). The ALJ determined that Mr. Figved could no longer perform his past work because, as light work, it exceeded his capacity for sedentary work. (R. 84). The ALJ then relied on the testimony of the vocational expert to find that Mr. Figved could still perform work that existed in significant numbers in the regional economy, including order taker, office clerk, and receptionist. (R. 86). Accordingly, the ALJ found Mr. Figved not disabled and not entitled to DIB under the Act. (R. 86).

## II.
## DISCUSSION
### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The court may not reweigh the

evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). But an ALJ is only required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). He must build a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The Seventh Circuit has called this requirement a "lax" one. *Berger*, 516 F.3d at 544.

As occurs so often where catch phrases are involved, the phrase, "logical bridge" appears to have, for some lawyers, taken on a life of its own, as though it were a self-defining and exacting test, which requires that an ALJ's decision be viewed grudgingly. But, as Justice Holmes warned, courts must be wary of the uncritical and indiscriminate use of labels and catch phrases: "It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing—phrases

which originally were contributions, but which, by their very felicity, delay further analysis...." Holmes, *Law and Science and Science and Law,* 12 Harv. L. Rev. 443, 455 (1899). Indeed, Judge Posner, who coined the phrase in the social security context in Sarchet, would be the first to acknowledge that it was not meant as a self-defining test or rigid formula. *Compare, e.g., United States v. Edwards,* 581 F.3d 604, 608 (7th Cir.2009)( "We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 990 (7th Cir.2004).

The point sought to be made in *Sarchet* was that unexplained conclusions by Administrative Law Judges, no less than by federal judges, are not persuasive and preclude meaningful appellate review. That the phrase was not intended to impose some elevated standard of review is clear from its reliance on *Herron v. Shalala,* 19 F.3d 329 (7th Cir.1994), where the court said: "Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence. .... We have repeatedly stated that the ... ALJ 'must articulate at some minimal level his analysis of the evidence.'" *Id.* at 333–334. (citations omitted). That formulation repeatedly appears in the cases. *See e.g., King v. Barnhart,* 66 Fed.Appx. 65, 69 (7th Cir. 2003); *Munoz v. Barnhart,* 47 Fed.Appx. 770, 773(7th Cir.2002)(Posner, Easterbrook, Manion, JJ.); *Garfield v. Schweiker,* 32 F.2d 605, 609 (7th Cir.1984)(Posner, Wood, Flaum, JJ.).Thus, *Sarchet* never intended that the "logical bridge" requirement compel or warrant a hypercritical approach to review of an ALJ's decision. The "logical bridge" requirement is not about *elegantia juris or* aesthetics. The ALJ need not build the Pont Alexandre III. A simple beam bridge will suffice so long as it allows the reviewing judge to traverse the divide between the evidence and the conclusions. The ALJ did that here.

**B.**

**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

**C.**

**Analysis**

Mr. Figved first claims the ALJ failed to consider how his pain impacted his functioning. Second, and along the same lines, he contends the ALJ's credibility determination was flawed.

Third, Mr. Figved argues that the ALJ did not weigh the various medical opinions in the record properly. And, finally, he submits that the ALJ failed to incorporate limitations from his seizure disorder into the residual functional capacity determination. Any other arguments Mr. Figved might have presented are deemed waived. *Gully v. Colvin*, 593 Fed.Appx. 558, 563 (7th Cir. 2014); *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013); *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004); *Hilmes v. Barnhart*, 118 Fed.Appx. 56, 60 (7th Cir. 2004).

## 1.

Mr. Figved contends that the ALJ completely ignored his complaints of pain and that his pain played no role in the ALJ's analysis. But, that is an odd and plainly unsupportable argument, given his concession that the ALJ repeatedly referenced his complaints of pain throughout his decision. [Dkt. # 14, at 8] and, as we shall see, necessarily credited to some extent, the claims of pain. His argument is that the ALJ he did not assess how that pain impacted the plaintiff's functional capacity. Of course, the ALJ did not have to believe" Mr. Figved, *Sarchet,* 78 F.3d at 307 or accept his testimony at face value. "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006). As Judge Posner has stressed in *Johnson*, "even where claims of pain predominate, all that is required is that the ALJ provide good reasons for disbelieving a claimant's allegations. *Id. See also, Pepper v. Astrue*, 712 F.3d 352, 368 (7th Cir. 2013)(Posner, J.); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir.2009). In short, "[d]espite the inherent difficulty of evaluating testimony about pain, an administrative law judge will often have solid grounds for disbelieving a claimant who testifies that [he] has continuous, agonizing pain." *Johnson,* 449 F.3d

at 806. What is forbidden is discounting or rejecting claims of pain "solely" because it seems in excess of objective medical testimony. *Johnson,* 449 F.3d at 805.

To this must be added Jude Posner's warning in *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004) that prohibiting an ALJ from rejecting complaints of pain solely because they may not be readily supportable by objective medical evidence is to give a "dispensation" that "invites the unscrupulous applicant to exaggerate his or her pain without fear of being contradicted by medical evidence. The administrative law judge must be alert to this possibility and evaluate the applicant's credibility with great care." *Id.* at 753.

Here, the ALJ rested his credibility determination on several factors: the objective medical evidence, the assessments of doctors including Mr. Figved's treating orthopedist, whose testimony is certainly entitled to considerable weight, and Mr. Figved's activities, which were quite at odds with his protestations of debilitating pain. The ALJ's credibility determination cannot be overturned unless it is "patently wrong," which means that it would have to lack any explanation or support. *Murphy v. Colvin,* 2014 WL 3586260, *3 (7th Cir. 2014); *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008). That is certainly not the case here.

Arguing otherwise, Mr. Figved relies exclusively on *Carradine*, 360 F.3d 751, but that case has little or nothing to do with the ALJ's decision here. *Carradine* holds that "'[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective medical evidence.'" *Id*. at 753. In *Carradine*, the source of the claimant's severe pain was, as the court said, psychological; she had been diagnosed

with a somatization disorder. *Id*. at 754. Therefore, it was wrong for the ALJ to completely discount the claimants allegations of disabling pain because doctors had been unable to find objective evidence of a physical source for the claimant's pain, and determine that she could continue performing her previous job. *Id*. at 755. That was exactly the error that *Johnson* warned against two years after *Carradine*.

Firstly, Mr. Figved does not allege that he has a somatoform disorder. The source of his pain is a back impairment. In other words, it is physical, not psychological– And thus not " entirely in the patient's mind," *Barnhart,* 449 F.3d at 806, thereby making it appropriate for the ALJ to look at the medical evidence to gauge whether Mr. Figved might be exaggerating – more on that later. As Judge Posner explained in *Carradine*, "[a]ppellate review of credibility determinations, especially when made by specialists such as the administrative law judges of the Social Security Administration, is highly limited because the reviewing court lacks direct access to the witnesses . . . , lacks the trier's immersion in the case as a whole, and when reviewing decisions by specialized tribunals also lacks the trier's experience with the type of case under review." 360 F.3d at 753.

Secondly, the ALJ plainly did not completely discount Mr. Figved's allegations of pain. Had he done so he would not concluded that he could continue to perform his past work. Mr. Figved's past work was medium or light. The ALJ found instead that he could no longer do that level of work and was limited to a reduced range of sedentary work. Obviously, he came to that conclusion because he credited to some extent Mr. Figved's claims of pain. *Depover v. Barnhart*, 349 F.3d 563, 567–68 (8th Cir.2003)(ALJ's failure to first express claimant's work-related abilities on a function-by-function basis did not require remand where required findings were implicit).

The regulations define sedentary work as requiring primarily sitting, some walking and standing, and minimal lifting. See 20 C.F.R. §§ 404.1567(a), 416.967(a). A claimant can do sedentary work if he can (1) sit up for approximately six hours of an eight-hour workday, (2) do occasional lifting of objects up to ten pounds, and (3) occasionally walk or stand for no more than about two hours of an eight-hour workday. *See Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995). Sedentary work "represents a significantly restricted range of work" in deference to physical and mental impairments that cause "very serious functional limitations," SSR 96–9p, 1996 WL 374185, at *3 (July 2, 1996). As the ALJ noted, the medical evidence repeatedly demonstrates, in the main, that physically, Mr. Figved exhibits normal strength and a good range of motion despite his impairment. (R. 77, 81, 755, 961, 1056, 1059, 1349, 1362, 1381, 1487, 1489, 1493, 1507).

The ALJ, rather than ignoring Mr. Figved's complaints of pain, credited them to the extent his pain precluded him from performing his past light and medium work, and limited him to sedentary work. Far from ignoring Mr. Figved's pain, the ALJ felt it resulted in "very serious functional limitations" – just not as serious as Mr. Figved claimed. It bears repeating that Mr. Figved's pain should not have been uncritically accepted and, as *Carradine* instructed, the ALJ should have been and was "alert to the possibility" of exaggeration by the claimant and must "evaluate the applicant's credibility with great care." *Carradine*, 360 F.3d at 753.

**2**.

That leads to a look at why the ALJ didn't fully believe Mr. Figved's complaints. For some reason, Mr. Figved reads the ALJ's opinion as positing only his daily activities as a reason for doubting his testimony. [Dkt. #14, at 9-10]. This is either a misreading of the opinion or a mischaracterization. As already noted, the ALJ based his credibility assessment not only on Mr.

Figved's daily activities, but on the objective medical evidence and the opinions of physicians as well. (R. 84-85). Each of these is a valid reason to discredit a claimant's claims of debilitating limitations. *See Olsen v. Colvin*, 551 Fed.Appx. 868, 876 (7th Cir. 2014)(medical evidence and daily activities); *Pepper v. Colvin*, 712 F.3d 351, 368-69 (7th Cir. 2013)(medical evidence); *Turner v. Astrue*, 390 Fed.Appx. 581, 583 (7th Cir. 2010)(physician's opinions); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005)(medical evidence); *Lippart v. Barnhart*, 63 Fed.Appx. 260, 266 (7th Cir. 2003)(physicians' opinions); *Walker v. Bowen*, 834 F.2d 635, 641–42 (7th Cir.1987).[1]

Mr. Figved argues that the ALJ's discussion of his daily activities runs afoul of a line of Seventh Circuit cases holding that an ALJ may not equate the ability to take part in some activities with an ability to perform work. [Dkt. # 14, at 9]. True, the Seventh Circuit has, time and again, chastised ALJs for finding that a claimant can hold down a full-time job just because he can do some chores around the house. *Moore*, 743 F.3d at 1126; *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). But, once again, Mr. Figved either misreads or mischaracterizes the ALJ's opinion because the ALJ did not do that here.

The ALJ did not say that Mr. Figved's activities were consistent with a capacity to hold down a full-time sedentary job; he specifically said that Mr. Figved's "activities are not so limited as one would expect from a totally disabled individual." – and that effectively is how Mr. Figved sought to portray himself. (R. 84). Remember that Mr. Figved claimed that his pain forced him to spend

---

[1] While it is not an argument Mr. Figved makes, it should be pointed out that this clearly is not an instance of the ALJ rejecting Mr. Figved's allegations based *solely* on the objective medical evidence. *Cf. Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). And, even where the Seventh Circuit has overturned an ALJ's credibility determination for being based solely on medical evidence, it has clearly held that the medical evidence is still relevant to a claimant's credibility. *Pierce*, 739 F.3d at 1050.

most of every day laying in bed, that he couldn't even sit for long because of his pain. Moreover, he claimed his seizures were not controlled, but were becoming more frequent. Lying in bed for nearly the entire day, every day clearly doesn't jibe with the activites Mr. Figved engaged in: mowing the lawn for three hours – even with breaks (R. 961), doing yardwork at his parents' house (R. 1221-22), driving three times a week (R. 47), taking public transportation frequently (R. 50), or attending classes. (R. 821).

The ALJ was entitled to consider the inconsistency between allegedly being bed-ridden most of every day and his admitted activities. "'[J]udges are competent to understand the obvious,'" *Eastman Kodak Co. v. Photaz Imports Ltd., Inc*. 853 F.Supp. 667, 674 (W.D.N.Y. 1993). So too are ALJs, who can use a combination of "objective evidence and common sense" to evaluate claims of pain and whether alleged symptoms establish an inability to work. *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010). *See also Dabertin v. HCR Manor Care, Inc.,* 373 F.3d 822, 830 (7th Cir.2004).

The ALJ appropriately made note of the contradictions between Mr. Figved's daily activities and his claims of incapacity. (R. 84). But he did not, as Mr. Figved incorrectly claims, say these activities translated into an ability to work; rather, the ALJ concluded, they proved he was exaggerating quite a bit. This mode of analysis is perfectly proper. *See Olsen v. Colvin*, 551 Fed.Appx. 868, 876 (7th Cir. 2014)(activities such as cooking, reading, shopping for groceries, watching television, and vacuuming undermined allegations of intense and persistent symptoms); *Lott v. Colvin*, 541 Fed.Appx. 702, 707 (7th Cir. 2013)(ability to paint nails undermined claimant's claim that she had severe difficulty using her hands); *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013)(activities such as driving, reading papers and magazines, talking on the phone with insurance companies, shopping, and preparing meals undermined allegations of extensive limitations); *Castile*,

617 F.3d at 930 (the plaintiff's daily activities including doing her own laundry, putting dishes in the dishwasher, attending birthday parties, and taking care of her dog, coupled with the objective evidence refuted her claim of disability).

Mr. Figved also complains that, in assessing his credibility, the ALJ failed to specifically recite and analyze each of the factors listed in SSR 96-7p and that remand is necessary. But, an ALJ is not required to recite, chapter and verse, those factors, and spend time analyzing each one specifically. *See Pepper*, 712 F.3d at 368 (upholding credibility finding based on medical evidence and daily activities); *Sawyer v. Colvin*, 512 Fed.Appx. 603, 608, 2013 WL 856509, *4 (7th Cir. 2013)(upholding credibility finding based on medical evidence and inconsistent statements); *McKinzey v. Astrue,* 641 F.3d 884, 891 (7th Cir. 2011)(upholding credibility determination based on medical evidence even where other two reasons were faulty); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010)(upholding credibility determination, despite flaws, based on objective medical evidence). It is enough that the ALJ referenced SSR 96-7p and considered Mr. Figved's allegations in light of it. (R. 74-75); *see Schmidt*, 496 F.3d at 843.

### 3.

That brings us to the medical opinions, which were one of the ALJ's bases for discrediting Mr. Figved's testimony. In the main, the various medical opinions of treating and examining physicians, as well as those who reviewed the record, supported a capacity for at least sedentary work. (R. 39-40, 415, 619, 618, 825, 952-957, 987, 1072, 1308). The only two outliers appear to be an opinion from Mr. Figved's chiropractors (R. 1023-27) and one opinion out of the three from his treating orthopedist. (R. 1056). Mr. Figved's main problem with the manner in which the ALJ addressed the opinion evidence is that he rejected the lone opinion from his treating orthopedist that

indicated he couldn't work. [Dkt. # 14, at 11-12].

A treating physician's opinion is entitled to controlling weight if supported by medical findings and consistent with substantial evidence in the record. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir.2009). An ALJ may reject a treating physician's opinion, as long as he provides good reasons for doing so. *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). That's exactly what the ALJ did here in rejecting that lone opinion from Mr. Figved's treating orthopedist, Dr. Schneider.

The various assessments of Mr. Figved's treating physician, Dr. Schneider, play a significant role here, as they did in the ALJ's analysis. Dr. Schneider saw Mr. Figved on January 4, 2010, and noted that he was going to school to be a public safety or emergency room dispatcher while on disability from his hospital job. The doctor said that would be "an appropriate job for him since he does have chronic back pain, but he can tolerate sitting and standing, and this is a sedentary type of position." (R. 821). Dr. Schneider encouraged him to exercise in addition to what he did at therapy. (R. 821). He said Mr. Figved was "very functional and is not taking any narcotics." (R. 812).

On March 2, 2010, Dr. Schneider reported that Mr. Figved was able to work as long as he did not lift more than 25 pounds, did not work on ladders or scaffolds, and did not hyperextend his spine. (R. 828). This assessment was essentially echoed by Dr. Savino in May 2010, after he reviewed an MRI taken on May 6th. The study revealed some degenerative disc disease from L1 to S1. Dr. Savino felt Mr. Figved was fine to work aside from lifting more than 25 pounds or standing for more than 4 hours. (R. 415). These assessments from Dr. Savino and Mr. Figved's treating orthopedist depict a greater capacity for work than the ALJ found.

Mr. Figved saw Dr. Schneider again on June 18, 2010. The doctor noted that Mr. Figved had come in previously hoping to get a disability parking placard. Dr. Schneider refused and encouraged him to get as much activity as possible. Dr. Schneider had a change of heart this time, however, noting that he had become worse. Where it once took him an hour to mow his lawn, it now took him 3 hours with breaks. His gait was mildly antalgic. (i.e., he was walking to relieve pain). Still, his reflexes and sensation were normal, straight leg raising was negative, and his extremities were "strong at 5/5." (R. 961).

Two weeks later, on June 30, 2010, Mr. Figved had his disability parking sticker, with Dr. Schneider checking the box that said Mr. Figved was "*severely* limited . . . in ability to walk due to an arthritic, neurological, or orthopedic condition." (R. 980)(Emphasis supplied). But, two months after that, Dr. Schneider wrote that Mr. Figved had a full capacity to walk, sit, turn, push pull, and an 80% (or more) capacity to bend, stand, and climb. (R. 987). He could lift up to 20 pounds at a time and frequently lift up to 10 pounds. (R. 84, 987). This would appear to be a conspicuous example of the Seventh Circuit's common sense recognition that a treating physician may "want to do a favor for a friend and client, and so ... may too quickly find disability," *Stephens v. Heckler,* 766 F.2d 284, 289 (7th Cir. 1985) and may "bend over backwards to assist a patient in obtaining benefits. ..." *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006). Be that as it may, what is certain is that once again, Mr. Figved's own treating doctor is opining that he has a *greater* capacity for work than the ALJ found.

Mr. Figved chastises the ALJ for citing this evaluation and submits that Dr. Schneider never wrote such a note (Dkt. # 14, at 11), but he is clearly wrong or attempting to mischaracterize the record. He cites a report from that same day in which Dr. Schneider states that he filled out

paperwork for Mr. Figved's disability. (R. 1061). Obviously, the doctor did just that, but felt that Mr. Figved was not completely disabled, but merely unable to perform work that was any more taxing than the specific restrictions he imposed. Restrictions, incidentally, which would essentially allow Mr. Figved to perform not only sedentary work as the ALJ found, but light work as well. *See* 20 CFR §404.1567(b).[2]

Mr. Figved saw Dr. Schneider again on January 3, 2011. Mr. Figved had begun having leg pain for the first time. Straight leg rasing produced left leg pain at 30 degrees. Reflexes and sensation were still normal throughout. Strength was still 5/5 and muscle tone was normal. Dr. Schneider recommended he see a pain specialist. (R. 1059).

On July 8, 2011, Mr. Figved went back to Dr. Schneider and said he had a disability report from his attorney for the doctor to fill out. (R. 1056). Examination that day revealed that, once again, Mr. Figved had normal reflexes and that his extremities were symmetrically strong at 5/5. Sensation was normal. Lumbar flexion was only slightly decreased and extension was full. He had some tenderness in his back. He was no longer complaining of leg pain and straight leg raising produced some back pain but no longer any leg pain. (R. 1056). Nevertheless, Dr. Schneider reported that he was "disabled for both orthopedic and neurologic reasons." Arguably – especially given the examination results and the previous assessments – this meant Mr. Figved was disabled from his heavier duties at the hospital, as the doctor mentioned his disability in terms of the hospital job (R. 1056), and sent a report directly to the hospital's disability counsel stating that Mr. Figved could

---

[2] Mr. Figved also submits that there was a "precipitous decline" in his condition from January 2010 to June 2010, which is borne out by Dr. Schneider's reports. [Dkt. # 14, at 10-11]. But that is clearly not the case as his examination results were essentially unchanged and, as of June 30, 2010, Dr. Schneider felt he was capable of doing light work.

never return to work. (R. 1066). The doctor clearly did not mean Mr. Figved was disabled from any type of work – only that he could not perform his prior duties at the hospital.

Still, perhaps exercising caution, the ALJ took Dr. Schneider to mean what Mr. Figved claims he meant: that Mr. Figved was completely disabled. Understandably, given the foregoing discussion of Dr. Schneider's assessments of Mr. Figved's condition, the ALJ discounted this opinion as contradicted by his treatment notes and his prior assessments. (R. 84). Those are perfectly valid reasons to reject a treating physician's opinion. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)(opinion inconsistent with treatment notes); *Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004)(opinion inconsistent with treatment notes); *Wurst v. Colvin*, 520 Fed.Appx. 485, 489 (7th Cir. 2013)(opinion inconsistent with treatment notes and other opinions); *Schreiber v. Colvin*, 519 Fed.Appx. 951, 958 (7th Cir. 2013)(opinion inconsistent with treatment notes); *Olsen v. Colvin*, 551 Fed.Appx. 868, 877 (7th Cir. 2014)(opinion inconsistent with other medical evidence and opinions); *Parrott v. Astrue*, 493 Fed.Appx. 801, 805 (7th Cir. 2012)(opinion inconsistent with other medical evidence).

Next, Mr. Figved argues that the ALJ had to assess each medical opinion in the record according the laundry list of factors set forth in the regulations, specifically addressing each factor as he does. Because he did not, Mr. Figved says the case must be remanded. [Dkt. # 14, at 12]. But that's not true. The Seventh Circuit has said, over and over, that an ALJ need not detail every reason for the weight he accords a medical opinion. He need only minimally articulate his reasoning to a degree that allows the reviewing court to follow it. *Wurst v. Colvin*, 520 Fed.Appx. 485, 488 (7th Cir. 2013); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir.2008). *Cf., Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir. 2006)("The judge's opinion is long

and painstaking, and though it is also jargon-ridden and in places opaque, we can make out what she was driving at.").

The ALJ's assessment of the medical opinions in this case was more than adequate. Given a record containing various medical assessments, it was up to the ALJ to weigh these, resolve conflicts and arrive at a conclusion. *Elder*, 529 F.3d at 415; *Schmidt*, 496 F.3d at 845; *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir. 1995). That's exactly what he did, as, in the main, the medical opinions in this case indicated that Mr. Figved could perform sedentary work, including more than one assessment from his own treating physician.

For example, Mr. Figved thinks that the ALJ should have afforded much more weight to the opinions of Dr. Luhrs – a chiropractor[3] – and Dr. Jordan – a sleep specialist. [Dkt. # 14, at 13]. The ALJ rejected Dr. Luhr's form opinion – which indicated, essentially, the Mr. Figved was incapable of any work and almost no activity (R. 1023-27) – because it was not supported by the evidence or her own notes. (R. 85). Again, those are valid reasons for rejecting an opinion, *see, e.g., Pierce*, 739 F.3d at 1051 (ALJ properly rejected chiropractor's report as uncorroborated by other evidence), and the notes bear the ALJ's reasoning out: "responded well . . . slightly reduced pain (R. 1406); "happy is better than prior to coming" (R. 1407); ". . . feels he is improving, happy with care" (R. 1408); "feeling pretty good today" (R. 1410). On occasions when Mr. Figved got worse it was because he "went to Tulsa" (R. 1413); he missed 4 months worth of appointments (R. 1415); he was "not following recommended care." (R. 1419). *Cf. Castile*, 617 F.3d at 930 (the ALJ reasonably concluded that Castile's "litany of alleged pain" was not entirely credible based on medical reports and missed appointments and failure to comply with medical treatment programs prescribed by her

---

[3] A chiropractor is not an acceptable medical source under the regulations. *Pierce*, 739 F.3d at 1051.

physicians).

As for Dr. Jordan, the ALJ rejected his opinion as unsupported as well. Unlike Dr. Luhrs, Dr. Jordan had a much more optimistic assessment of Mr. Figved's capacity for work. His CPAP machine was working well, and he was capable of tolerating moderate stress and his concentration would rarely be affected. (R. 1072, 1308). It's certainly nothing that would suggest an inability to work, so it's not even clear why Mr. Figved would take the ALJ to task for rejecting it. But, even though the opinion undermines Mr. Figved's claim for disability benefits, the ALJ still rejected it – properly so – because there was no supporting documentation in the record.

**4.**

Finally, Mr. Figved argues that the ALJ failed to account for his seizure disorder in his RFC. It was not enough, Mr. Figved argues, that the ALJ restricted him from climbing, working at heights, around machinery, or in extreme temperatures because he also has "cognitive loss." [Dkt. # 14, at 14]. It's not much of an argument. Mr. Figved relies on the November 2009 report of Dr. Husil, which the ALJ summarized at length. (R. 78). On the subject of cognitive loss, the doctor said Mr. Figved's cognition had been *stable* since 2005 – when he was *working* – and that his delayed verbal recognition score, although declined, was in the average range of performance and not clinically significant. (R. 78, 862). In addition, his seizures were under control. (R. 862).[4] Average cognitive

---

[4] Mr. Figved claims that his family and friends filled out reports indicating that he had *at least one seizure per month*. [Dkt. # 14, at 14]. This is yet another mischaracterization of the record which, as they accumulate, become not only frustrating but suspicious and tend to undermine a claimant's claim for benefits. Actually, his mother reported he had seizures every 3 months (R. 276), his friend had not witnessed a seizure for about 8 months (R. 277), and his father alternately said they occur every 2-3 months, or every 3-4 months. (R. 278). Not one of these reports, then, supports Mr. Figved's claim of a seizure every month.

ability cannot possibly be equated with disability, as Mr. Figved seems to suggest. The ALJ treated this report exactly as he should have.

## CONCLUSION

"'The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment.'" *Johnson,* 449 F.3d at 805. As the ALJ found, while Mr. Figved has health issues, they are not such as to conclude that he is disabled within the meaning of the Act and incapable of working under the conditions imposed by the ALJ. The plaintiff's motion for remand [Dkt. #13] is DENIED, and the Commissioner's motion for summary judgment [Dkt. #18] is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: May 7, 2015